# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GERALD FULLER,

    Plaintiff,

    v.

CORIZON, INC.,
HOLLY PIERCE, RNP,
FRANK B. BISHOP,

    Defendants.

Civil Action No.: PWG-19-1705

## MEMORANDUM OPINION

Ripe for disposition in this civil rights case are Motions to Dismiss or for Summary Judgment filed by Defendant Frank Bishop (ECF 22) and Defendants Corizon and Holly Pierce (ECF 21), which are opposed by Plaintiff Gerald Fuller. ECF 25. Also pending for the Court's review are Plaintiff's Motions to Proceed In Forma Pauperis (ECF 2), which the Court grants subject to periodic payments as required under 28 U.S.C. § 1915, and for Appointment of Counsel (ECF 14), which the Court shall deny.[1] The matters pending are fully briefed, and the Court deems a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, the Court grants Defendants' motions, construed as Motions for Summary Judgment, denies injunctive relief and dismisses the complaint.

---

[1] A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances." *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by *Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel). Exceptional circumstances include a litigant who "is barely able to read or write," *Whisenant* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008). Upon careful consideration of the motions and previous filings by plaintiff, the court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. No exceptional circumstances exist that warrant the appointment of an attorney to represent plaintiff under § 1915(e)(1).

# Background

## I.     Complaint Allegations

Plaintiff Gerald Fuller is an inmate committed to the custody of the Maryland Department of Public Safety and Correctional Services (DPSCS) and confined at North Branch Correctional Institution (NBCI) at all times relevant to the complaint.  Mr. Fuller initiated this civil rights case with an "Emergency 42 U.S.C. § 1983 Civil Complaint" in which he claimed that he has a cardiac condition and chronically high blood pressure, for which he has been hospitalized twice.  ECF 1 at 1.  Mr. Fuller takes multiple blood pressure medications, potassium supplements, and daily aspirin doses and claims that Defendant Holly Pierce, RNP, "caused and allowed" his prescriptions to lapse, resulting in Mr. Fuller's hospitalization on an emergency basis.  *Id*. at 2, ¶¶5 & 6.  He also accuses Pierce of allowing another inmate, Walter Taylor, to have a massive heart attack on May 29, 2019, which resulted in Taylor's death.  *Id*. at ¶7.

At the time of his complaint Mr. Fuller alleged he had been filing sick call slips and administrative remedy complaints (known as ARPs) regarding the interruption in his medication but had not been seen by medical staff for blood pressure checks and had not been seen "by an agent of the Warden."  ECF 1 at 2, ¶8.  Mr. Fuller maintained that he could "have a stroke or a heart attack at any time . . . making this action an emergency request for intervention."  *Id*. at ¶9.

In his first supplemental complaint, Mr. Fuller alleges that he went without his medication for 30 or more days and that Holly Pierce stopped his medication twice in an effort to cause his death.  ECF 5 at 1.  He claims that his sentence was overturned in January of 2017[2] and since then,

---

[2]     The legality of Mr. Fuller's current confinement is not a matter before this Court.

there has been an effort to interrupt the healthcare he was receiving. *Id*. He adds a claim that he was placed on an experimental drug[3] that caused his health to deteriorate. *Id*.

In an affidavit attached to the first supplement Mr. Fuller recounts his medical history from 2011 when he was hospitalized at Peninsula Regional Medical Center in Salisbury, Maryland with moderate to severe left ventricular hypertrophy. ECF 5-1 at 1, ¶3. While hospitalized, Mr. Fuller learned that he also had degenerative joint disease and a potassium deficiency. *Id*. at ¶4.

Mr. Fuller states that in July of 2011 he fractured his left ankle which "went untreated by Corizon, Inc. Medical Officials while at Eastern Correctional Institution (ECI)." *Id*. at ¶5. Despite having a fractured ankle, Mr. Fuller alleges that Corizon medical staff approved his transfer from ECI across the State to NBCI, without crutches. *Id*. at 2, ¶ 6. When he arrived at NBCI, he claims that Corizon officials authorized his placement on a top bunk on the top tier of the housing unit, which required him to climb steps, "even though they knew my ankle was fractured." *Id*. at ¶7.

In September of 2017, Mr. Fuller alleges that Holly Pierce terminated his arthritis medication without warning or notice, causing his arthritis to worsen. *Id*. at ¶8.

In July of 2018, Mr. Fuller states that his "blood pressure went out of control," and he was hospitalized. ECF 5-1 at 2, ¶8. At that time his medications were changed. *Id*.

The following month, Mr. Fuller claims that Holly Pierce allowed his potassium supplements to expire. *Id*. at ¶9. When Mr. Fuller "complained in writing" that he was hypokalemic and asked to have his blood drawn, his requests were ignored. He states that it was not until "a routine blood draw" that "it was caught by other medical officials and [he] was sent out of the prison for emergency treatment." *Id*.

---

[3]     Mr. Fuller expands on this claim in his Opposition Response, alleging that he was given the drug Valsartan for his blood pressure from 2010 to 2015, resulting in kidney tumors. ECF 25-1 at 3.

Mr. Fuller alleges that two other inmates, Earl Wilkens, who was confined at Maryland Correctional Institution Hagerstown, and Walter Taylor, confined at NBCI, died of strokes and/or heart attacks while under the care of medical staff employed by Corizon, Inc. ECF 5-1 at 2-3, ¶¶10&11. He states that he is aware of Mr. Wilkens death in 2009 because Mr. Wilkens had Mr. Fuller "subpoenaed as a Representative witness." *Id*. at ¶10. He claims that Mr. Taylor complained of chest pains and the need for medication, but Holly Pierce refused to see him, and he was found dead in his cell later that day. *Id*. at ¶11. Mr. Fuller concludes from these anecdotes that "Holly [P]ierce has a history of stopping older more medically dependent prisoners' medications without notice or warning as a cost saving measure and without regard for the prisoners' health and well being concerns." *Id*. at ¶12.

Mr. Fuller claims that when his medications were "stopped, stolen or lost and Pierce refused to respond to sick calls and complaints . . . [he] was able to survive and prevent a heart attack or stroke by buying or doing work for other prisoners who may have had a extra pill or two." ECF 5-1 at 3, ¶13. Mr. Fuller's second supplemental complaint consists of ARP complaints and sick call requests regarding medication renewals. ECF 8.

## II.    Response to Show Cause

Given the gravity of Mr. Fuller's assertions this Court directed counsel for the DPSCS to show cause why emergency injunctive relief should not be granted in favor of Mr. Fuller prior to service of the complaint. ECF 7. Counsel filed the response together with declarations from Sharon Baucom, M.D. and Warden Bishop. ECF 9-2 and 9-3.

Sharon Baucom, M.D. is the Director of Clinical Services for the Maryland DPSCS and is a licensed physician. ECF 9-2 at ¶1. In that capacity, Dr. Baucom "monitors care provided to inmates by medical and mental health private contractors." *Id*. She explains that Mr. Fuller has

"a number of complex medical issues that have resulted in medical care including off-site emergency care, hospitalizations, infirmary admissions and housing in skilled care on site for close monitoring of his health care issues." *Id*. at ¶2. Mr. Fuller's diagnoses include "severe uncontrolled Hypertension, chronic Rheumatoid Arthritis, Hepatitis C, Macular Degeneration, and chronic pain." *Id*. When the causes of his "chronic recurrent hypokalemia" were investigated, a CT scan located and identified an "adrenal mass." *Id*. Dr. Baucom explains that "[h]ormones produced by the adrenal gland, can precipitate loss of potassium by the body, as well as severe hypertension and many of the symptoms complained of and experienced by Mr. Fuller." *Id*.

With regard to Mr. Fuller's cardiac issues, Dr. Baucom explains that on July 28, 2018, Mr. Fuller was sent to the emergency room (ER) for what was confirmed by an EKG as bradycardia with a heart rate of 53. ECF 9-2 at 2. While in the hospital Mr. Fuller was evaluated by Dr. Judson, a cardiologist, who noted "intermittent bradycardia and intermittent second- and third-degree block *related to some Blood Pressure (BP) medication*." *Id*. (emphasis in original). In short, Mr. Fuller's symptoms were "a side effect of his blood pressure medications, not a cardiac condition related to ongoing cardiac disease." *Id*. At the time, Mr. Fuller was taking a potassium supplement and a potassium sparing medication, Coreg.[4] *Id*. He was taken off of the Coreg and his symptoms subsided. *Id*.

Dr. Baucom also explains that Mr. Fuller's kidney condition complicates his treatment options for hypertension:

> The incidence of adrenal tumors causing this type of clinical issues (sic) is very uncommon. The tumor did not show on the ultrasound of the kidney that was suggested by the consultant. However, further testing utilizing a CT scan did demonstrate the adrenal tumor on his kidney. This hypertension is unusually hard to control, and patients are often on four or more blood pressure

---

[4] Coreg or Carvedilol is used to treat high blood pressure and heart failure and works by blocking the action of certain natural substances in the body, such as epinephrine, on the heart and blood vessels. *See* https://www.webmd.com/drugs/2/drug-1634/coreg-oral/details (last visited Nov. 13, 2019).

medications. The hypertension may cause headaches, blurred vision, and dizziness. While patients with hyperaldosteronism may have normal potassium levels, *many patients may have low potassium levels.* The hypokalemia (low potassium level) can cause symptoms like fatigue, numbness, increased urination, increased thirst, muscle cramps, and muscle weakness.

ECF 9-2 at 2 (emphasis in original). She further explains that "[h]idden endocrine tumors, like the adrenal tumor identified by CT scan of Mr. Fuller, made the combination of potassium and a potassium sparing diuretic potentially dangerous." *Id*. Mr. Fuller's potassium levels were closely monitored, but did not remain stable due to "the erratic release of certain hormone[s] released by the adrenal tumor." *Id*. Furthermore, Dr. Baucom states that the "increasing levels of potassium being prescribed could have provoked toxic high levels of potassium as well." *Id*. Also complicating the task of monitoring Mr. Fuller's electrolytes was his treatment for Rheumatoid Arthritis. *Id*. In summary, Dr. Baucom states that "[t]here is no medication that should be arbitrarily renewed, simply because it has always been prescribed" because "multi-factorial clinical side effects that can develop and new biochemical situations, like drug treatments for Rheumatoid Arthritis with Prednisone, . . . can . . . adversely impact existing conditions and alter continuation of previously routine chronic medications." *Id*. at 2, ¶3.

On November 27, 2019, a second Order to Show Cause was issued directing Defendants to respond to Mr. Fuller's affidavit indicating that his potassium medication had been changed in a manner that was not medically sound and that he feared for his life. *See* ECF 28, 29. The responses to that Order (ECF 30, 31), which included sworn declarations, indicated that changes in Mr. Fuller's potassium medication were made under the care of an endocrinologist with consideration for his compliance with medication as well as other medications he was prescribed. ECF 30 at 2; ECF 31 at 1-2. Based on the submissions received, this Court found that Mr. Fuller is receiving appropriate medical attention. ECF No. 35.

## III.    Defendants' Response

### A.    Medical Defendants

Defendants Corizon Health, Inc. and Holly Pierce, RNP (Medical Defendants), provide further detail regarding Mr. Fuller's medical conditions and the treatment provided.  ECF 21.  The hypertension medications he has been prescribed are: (1) Calan SR ("verapamil hydrochlorate") 240 mg twice a day; (2) Aldactone ("spironolactone"), 25 mg; (3) Hytrin ("terazosin hcl"), 2 mg daily; (4) Cozaar ("losartan"), 100 mg daily; (5) Coreg ("cardedilol"), 25 mg twice a day; and (6) Lasix ("furosemide"), 40 mg daily.  ECF 21-12 at 3, ¶8 (Decl. of Holly Pierce, RNP); ECF 21-2 at 98 (medical record).  For hypokalemia Mr. Fuller has received: (1) Aldactone,[5] 25 mg daily; and (2) Klorcon M20 ("potassium chloride"), two 20 meq tablets, twice a day, for a total of 80 meq, ECF 21-12 at 3, ¶9.  For osteoarthritis and chronic pain, Mr. Fuller was given: (1) high potency capsaicin, 0.1 % cream; (2) glucosamine chondroitin, 500 mg-400 mg one pill twice a day; (3) Tylenol ("acetaminophen"), 325 mg tablet twice a day as needed; (4) Ultram,[6] 200 mg once at hours of sleep ("hs"); and (5) Mobic ("meloxicam"), 7.5 mg once a day.  ECF 21-12 at 3, ¶10.

Pierce states that Mr. Fuller's Ultram prescription was not renewed pursuant to Dr. Odifie's August 29, 2017 order prescribing 30 days of Ultram with no renewal, a recommendation to increase the dosage of Tylenol to 500 mg every eight hours, and weight loss.  ECF No. 21-12 at 2, ¶6 and 4, ¶10.  Pierce did not terminate the Ultram prescription as alleged by Mr. Fuller.  *Id*. at 2, ¶6.  In response to Mr. Fuller's statement on September 28, 2017, indicating he no longer wished to take Mobic, a non-steroidal anti-inflammatory (NSAID), Pierce discontinued that prescription

---

[5]    Aldactone, a medication referenced by Dr. Baucom, treats hypertension and is a potassium sparing medication.  ECF 21-12 at 3, ¶9.
[6]    Ultram is a synthetic opioid which is addictive and subject to abuse and is currently considered inappropriate for long term treatment of osteoarthritis.  ECF 21-12 at 2, ¶6.

and prescribed Indocin as requested by Mr. Fuller. *Id.* at 4, ¶11. Mr. Fuller was, however, unhappy with the treatment plan because Pierce did not agree that he required a medical cell to accommodate his request for "higher toilets" and space to exercise. *Id.* She notes that there is a yard, indoor gym, and a training circuit available to the inmates at NBCI. *Id.*, *see also* ECF 21-2 at 93.

When Pierce saw Mr. Fuller on October 3, 2017, he demanded Ultram 200 mg or something stronger for his arthritis pain. ECF 21-12 at 4, ¶12. She states that when she "attempted to educate [Mr. Fuller] regarding Ultram, weight loss, and a healthy diet . . . he became extremely mad" and threatened a lawsuit if the Ultram prescription was not reinstated. *Id.*, *see also* ECF 21-2 at 90-91. Mr. Fuller continued to request Ultram for treatment of his arthritis pain and would not consider other medication such as Cymbalta (ECF 21-2 at 66-68), threatened legal consequences if he did not receive Ultram or a bilateral knee replacement (*id.* at 60-63), and, although physical therapy was provided for him, was uncooperative with that process (*id.* at 25-30, 35-41, 44-45, 58-59, and 60-63). An x-ray of Mr. Fuller's knees taken on February 16, 2018, revealed mild to moderate degeneration of the joints in both knees. ECF 21-12 at 7, ¶25.b. During this time, Mr. Fuller exhibited no trouble walking with the assistance of a cane, had full range of motion, was able to play basketball, and no deformity or swelling of his joints was noted. *See e.g.* ECF 21-2 at 14-16, 42-43, 53.

On July 25, 2018, Dr. Getachew, the Regional Medical Director, evaluated Mr. Fuller's chronic conditions including his arthritis. ECF 21-12 at 9, ¶36.b. Based on Mr. Fuller's symptoms and history, Dr. Getachew suspected Mr. Fuller might have Rheumatoid Arthritis ("RA") and ordered lab tests as well as x-rays of his wrists, elbows, neck, and knees. *Id.* Pending the outcome of those tests, Dr. Getachew renewed Mr. Fuller's orders for a cane and large cuffs. *Id. see also*

ECF 21-2 at 5-8. The test results, received on August 8, 2018, indicated that Mr. Fuller has RA and he was referred to a rheumatologist for evaluation. ECF 21-12 at 10-11, ¶44, *see also* ECF 21-11 at 3-5 (referral to rheumatologist). On August 12, 2018, Pierce prescribed Ultram 50mg twice a day for 30 days based on the new diagnosis of RA. ECF 21-12 at 12, ¶46. The prescription was renewed for another 30 days on September 14, 2018, pending Mr. Fuller's referral with a rheumatologist (*id*. at ¶48) and was renewed again in October and November of 2018 (*id*. at ¶51).

The evaluation by the rheumatologist occurred on September 25, 2018, but the results of that referral had not been received on November 20, 2018, when Mr. Fuller was evaluated by Dr. Getachew. ECF 21-12 at 13, ¶52.b. Dr. Getachew noted that if Mr. Fuller's lab results were negative for an active or latent tuberculosis infection, he planned to start Mr. Fuller on medication designed to address RA recommended by the rheumatologist. *Id*. In the meantime, Dr. Getachew made a note to continue the prescription for Ultram to address the pain and ordered x-rays. *Id*.

On December 10, 2018, Pierce saw Mr. Fuller regarding the rheumatology consult. ECF 21-12 at 14, ¶53. The rheumatologist prescribed Prednisone 40mg per day, tapering the dose by 10 mg every two weeks until a maintenance level of 10 mg every day was reached, to be maintained until a follow-up appointment. *Id*. In addition, Mr. Fuller was prescribed Trexall 15 mg once a week and folic acid supplements daily. *Id*. Pierce advised Mr. Fuller to avoid contact with sick individuals while taking the medications due to an increased risk of illness and to report any skin changes that occurred. *Id*. Lab tests were ordered for two to three weeks and every three months thereafter; x-rays of Mr. Fuller's hands and wrists were also ordered; and a follow-up referral with the rheumatologist was written to occur in four months. *Id*. Two days later, Dr. Getachew approved the prescriptions for Trexall, folic acid, and Ultram, but noted that the Ultram prescription would not be refilled since Mr. Fuller was receiving prescribed medications to address

pain associated with the RA.  ECF 21-12 at 15, ¶57.  On December 28, 2018, Mr. Fuller reported reduced pain while taking Prednisone, Trexall, and folic acid.  *Id*. at ¶60.

More concerning and difficult to address are Mr. Fuller's hypertension and hypokalemia. His hypertension and hypokalemia were, however, well controlled between November 29, 2017 through early July of 2018.  *See* ECF 21-12 at 5, ¶17; 6 at ¶22; 7 at ¶25a & d; 8 at ¶¶34-35.  During that time, Mr. Fuller was taking three blood pressure medications: verapamil, lisinopril, and Coreg. ECF 21-12 at 5, ¶17; ECF 21-2 at 70-75.  Dr. Ashraf reduced the dosages of Lasix and potassium chloride provided to Mr. Fuller on November 29, 2017, after it was determined that his creatine level had increased.  *Id*.

In February of 2018, Mr. Fuller's blood pressure was being treated with "ARB (angiotension receptor blockers) therapy; beta-blocker therapy; CCB (combination calcium channel therapy); diuretic therapy; and Aldactone therapy" as well as a low sodium diet.  ECF 21-12 at 7, ¶25.  His potassium chloride was increased from "20 Meq" per day, to "80 meq" per day by Defendant Pierce.  *Id*., *see also* ECF 21-2 at 48-51.

On July 25, 2018, Mr. Fuller's blood pressure was elevated (164/89), but he admitted he had not taken all of his medications at the time it was measured.  ECF 21-12 at 9, ¶36a.  At the time, Mr. Fuller's prescribed medications were "KOP" or "keep on person" which meant he kept his medication in his cell for self-administration.  ECF 21-12 at 8, ¶35a.  When Dr. Getachew noted Mr. Fuller's elevated blood pressure on July 25, 2018, he made a plan to increase the medications provided if his blood pressure remained greater than 140/90.  *Id*. at ¶36a.

Three days later, Mr. Fuller reported a slowed heart rate ("bradycardia") to a nurse and stated his concern that he had a stroke.  ECF 21-12 at 9, ¶37.  Symptoms of a stroke were ruled out, but an EKG indicated a "marked sinus bradycardia with a heartrate of 53," therefore, Mr.

Fuller was given 81 mg of aspirin and sent to Western Maryland Regional Medical Center by ambulance. *Id.*, *see also* ECF 21-2 at 2-4.

Mr. Fuller remained hospitalized until August 3, 2018 with significantly elevated blood pressure and bradycardia. ECF 21-12 at 11, ¶38. During his stay, hospital doctors found it difficult to reduce Mr. Fuller's blood pressure due to the side effects caused by the various medications he was on; they diagnosed Mr. Fuller with "AV disassociation and bradycardia" and attributed the condition to "polypharmacy or the use of multiple medications to treat his hypertension." *Id.* To address the problem, the cardiologist took Mr. Fuller off of Coreg and Verapamil. *Id.* When Mr. Fuller was discharged to the infirmary at NBCI from the hospital he was prescribed Prinivil ("lisinopril"), 20 mg., one by mouth twice daily; hydralazine HCL, 50 mg.; Norvasc ("amlodipine besylate"), 10 mg., one by mouth every day; and isosorbide mononitrate ER 60 mg. *Id.* at ¶39. Mr. Fuller was to remain in the prison infirmary until his hypertension was controlled. *Id.*

When Mr. Fuller's hypertension remained high and his treatment history in the hospital was reviewed, Dr. Ali Yahya increased his hydralazine to 75 mg three times per day. ECF 21-12 at 11, ¶40. On August 4, 2018, Dr. Yahya re-evaluated Mr. Fuller and noted he continued to have uncontrolled hypertension and he was reporting chronic pain "all over." *Id.* at ¶41. Dr. Yahya continued the NSAIDs as needed, increased the patient's hydralazine to 100 mg three times a day to control his hypertension, and the bradycardia was resolved. *Id.* Mr. Fuller remained in the infirmary until August 6, 2018, where he was closely monitored by Dr. Yahya, Nurse Practitioner Self, and the nurses. ECF 21-12 at 11, ¶42. When he was discharged from the infirmary, Mr. Fuller's hypertension was being treated with the following medications: Norvasc, 10 mg once a day; lisinopril 20 mg, two tablets twice a day; hydralazine HCL, 100 mg; isosorbide mononitrate

ER 60 mg; Aldactone 25 mg, once a day; Lasix, 20 mg one a day. *Id*. at ¶43. In addition, he was receiving 80 meq of potassium chloride per day to treat the hypokalemia. *Id*.

Pierce saw Mr. Fuller on August 12, 2018, following two blood pressure readings of 180/100 and 180/88. ECF 21-12 at 12, ¶45. Pierce ordered Clonidine 0.1mg and repeat blood pressure in two to three hours. *Id*. Mr. Fuller blamed his heightened blood pressure on the changes in his medication when he was in the hospital and asserted that it was better controlled when he was taking Ultram. *Id*. Mr. Fuller's blood pressure was checked on August 13, 14, and September 4, 2018; it remained elevated but had improved. *Id*. at ¶47.

On September 25, 2018, Mr. Fuller complained of dizziness to a nurse; his blood pressure measured 102/84. He was provided salty chips to raise his blood pressure. ECF 21-12 at 12, ¶49.

On October 1, 2018, Mr. Fuller's prescriptions for Aldactone and potassium supplements expired; both medications were designated as "keep on person" medications. Pierce explains that with such medications the patient is expected to remain aware of the expiration and alert medical staff two weeks before the expiration date so they may be renewed. ECF 21-12 at 13, ¶50. Despite that fact, when Pierce saw Mr. Fuller on October 10, 2018, he did not mention that the prescriptions had expired. *Id*.

When Mr. Fuller was again evaluated on November 20, 2018 by Dr. Getachew, his blood pressure was 160/80. ECF 21-12 at 13, ¶52a. Pierce notes that Mr. Fuller "apparently did not raise the expiration of the Aldactone and potassium supplementation to Dr. Getachew, because Dr. Getachew did not renew those medications." *Id*. at 14, ¶52d. There were, however, no signs or symptoms of low potassium. *Id*.

By December 11, 2018, when Mr. Fuller's lab results were received, his potassium level had dropped to 2.8; Pierce sent him to the Western Maryland Regional Hospital by private van for

treatment of hypokalemia. ECF 21-12 at 15, ¶54. When he returned later that day, after receiving both oral and IV administered potassium, Mr. Fuller was admitted to the prison infirmary. *Id*. at ¶55. The EKG performed at the hospital was normal. *Id*. Dr. Getachew ordered: a continuation of Potassium Chloride E-R 40 meq daily for ten days; 23 hour hold in the infirmary for evaluation; and 20 mg. of Lisinopril and 100 mg. hydralazine to reduce his blood pressure. *Id*. The following day, Mr. Fuller was discharged from the infirmary; he remained on potassium 40 meq per day and was instructed to return for a follow-up in five to seven days for labs. *Id*. at ¶56.

Pierce saw Mr. Fuller on December 19, 2018, when he complained that prior to his hospitalization he was prescribed Cozaar (aka losartan potassium), but it had been discontinued. ECF 21-12 at 15, ¶58. He expressed concern that stopping the potassium supplement may be the cause for needing to "void often at night." *Id*. When measured, Mr. Fuller's potassium level was within normal limits (3.7); nevertheless, Pierce ordered additional lab studies and a urinalysis. *Id*. At that time Mr. Fuller was taking "potassium 20 meq. daily." *Id*. Mr. Fuller had submitted refill requests for several of his medications on December 17, 2018, and complained on December 22, 2018, that he was running out of medication. *Id*. at 16, ¶59. On December 23, 2018, his potassium level was still within normal range at 3.6. *Id*.

On January 7, 2019, Pierce reviewed Mr. Fuller's lab results and found that his potassium level had dropped to 3.1, but he remained asymptomatic. ECF 21-12 at 16, ¶61. In order to address the decrease, Pierce increased Mr. Fuller's potassium supplement to 40 meq for ten days and ordered repeat labs. *Id*. However, on January 19, 2019, Mr. Fuller's potassium level remained at 3.1. *Id*. at ¶63. Pierce ordered another increase in potassium to 60 meq for five days with a decrease to 40 meq and repeat labs. *Id*.

On February 1, 2019, Mr. Fuller's lab results revealed his potassium level remained the same despite the increase in dosages for his supplements. ECF 21-12 at 16, ¶64. The potassium supplement was again raised to 60 meq per day and repeat lab tests were ordered. *Id*. Mr. Fuller's potassium level improved to 3.2 eight days later and improved again to 3.4 by February 12, 2019. *Id*. at ¶65.

When Dr. Getachew evaluated Mr. Fuller on February 19, 2019, he noted that the cause of Mr. Fuller's hypokalemia was unclear, particularly since his potassium level remained low despite the supplements he was taking. ECF 21-12 at 17, ¶66b. Dr. Getachew noted that Mr. Fuller was taking methotrexate for his RA which can cause hypokalemia in patients over the age of 60. *Id*. Dr. Getachew planned to discuss alternative medications with Mr. Fuller's rheumatologist. *Id*. Mr. Fuller's hypertension remained uncontrolled at this time, therefore Dr. Getachew added to Mr. Fuller's medications Aldactone 25mg to help with the hypokalemia as well as his blood pressure, with a plan to monitor Mr. Fuller's electrolytes for the following one to two weeks. *Id*. at ¶66c. The potassium supplement was reduced from 60 meq daily to 40 meq daily. *Id*. Additional tests ordered by Dr. Getachew at this time included an EKG, blood tests, and a chest x-ray. *Id*. at ¶66d. Mr. Fuller's potassium level dropped to 3.3 on February 23, 2019, despite the medications provided. *Id*. at ¶67.

On March 11, 2019, Dr. Getachew began to suspect that Mr. Fuller may have an adrenal tumor, given his history of hypertension and hypokalemia. ECF 21-12 at 18, ¶69. To investigate that possibility, Dr. Getachew planned to consult with a nephrologist, obtain a CT scan of Mr. Fuller's abdomen and pelvis, and attempt to obtain hospital records from 2011 when Mr. Fuller was admitted for treatment of hypokalemia. *Id*. The CT Scan occurred on March 26, 2019, and the results were reviewed with Mr. Fuller on April 9, 2019. ECF 21-12 at 18, ¶¶70 & 72. The

scan showed that Mr. Fuller has an 18 mm left adrenal nodule; Dr. Getachew ordered an increase of Aldactone to 25 mg twice per day after he was advised of the results. *Id*. at ¶72. In a note dated April 11, 2019, Dr. Getachew noted a "possible condition of adrenal neoplasm of uncertain behavior" and recommended an MRI of the adrenal gland. *Id*. at ¶73.

On May 10, 2019, Dr. Getachew saw Mr. Fuller for complaints of chest pain. ECF 21-12 at 19, ¶75. Dr. Getachew consulted with Holly Pierce and together they decided to send Mr. Fuller to the emergency room due to concerns that he may have coronary artery disease. *Id*. Mr. Fuller was returned to the prison the same day in stable condition; the tests run at the hospital were all negative, his potassium level was 4.5, and his blood pressure was elevated at 182/98 because he had not received his medication that day. *Id*. at ¶76. Dr. Getachew renewed Mr. Fuller's medications which included a potassium supplement 20 meq once a day and Aldactone 25mg once a day. *Id*. at ¶77.

Mr. Fuller began complaining that he was running out of medications in May and June of 2019. *See* ECF 21-12 at 19, ¶74; and at 20, ¶¶79- 81. On May 28, 2019, Pierce refilled Mr. Fuller's prescription for isosorbide mononitrate ER 60 mg and noted that Dr. Getachew had reordered medications on May 10, 2019, but old orders had not been discontinued. ECF 21-12 at 20, ¶78. Pierce corrected the oversight. *Id*. Two days later, Mr. Fuller reported he had been out of his blood pressure medications, the same medications renewed on May 10 and 28, 2019, for about four days, but then said he had received them that morning. *Id*. at ¶79. On June 6, 2019, Mr. Fuller refused to sign a questionnaire for the MRI that had been ordered because he was not receiving his medications. *Id*. at ¶80. The next day, Mr. Fuller sent in a sick call slip stating his lisinopril was running out; a new order for the medication was obtained. *Id*. at ¶81. On June 10, 2019, Mr. Fuller's prescriptions for Norvasc and lisinopril were refilled by Pierce. *Id*. at ¶82. On

June 13, 2019, Mr. Fuller reported he was experiencing a headache; a blood pressure check revealed his blood pressure was 190/94. *Id*. at ¶83.

By July 24, 2019, Mr. Fuller's blood pressure had lowered (146/85) and his potassium level was within normal range at 3.8. ECF 21-12 at 21, ¶87, *see also* ¶89 (indicating blood pressure was 120/50 on July 29, 2019). On July 29, 2019, Mr. Fuller received an MRI for further imaging of the adrenal tumor found on his CT Scan. *Id*. at ¶88.

The MRI results were reviewed with Mr. Fuller on August 9, 2019; the 18mm left adrenal nodule was imaged, but its characteristics did not fulfill MRI criteria for an adenoma.[7] *Id*. at ¶92. A biopsy was recommended to obtain a definitive diagnosis. *Id*. In addition, a 13mm right adrenal nodule was imaged as well as "bilateral renal cysts" with the largest being located on the left at a maximum dimension of 10 cm. *Id*. A consultation request with an endocrinologist was pending at this time. *Id*. A chest x-ray performed on August 13, 2019, showed no evidence of acute cardiopulmonary disease. *Id*. at ¶93.

On September 12, 2019, Mr. Fuller saw an endocrinologist, who spoke with Pierce and indicated that Mr. Fuller's condition was stable and there was no concern that he has cancer; rather, the endocrinologist diagnosed Mr. Fuller with a condition known as primary hyperaldosteronism.[8]

---

[7]    "Renal adenoma: renal adenomas are the most common benign kidney tumors. They are small, slow-growing tumors that are often found on imaging tests (such as CT scans) when the doctor is looking for something else." https://www.cancer.org/cancer/kidney-cancer/about/what-is-kidney-cancer.html (last visited November 20, 2019).

[8]    Columbia University Irving Medical Center provides the following information about Hyperaldosteronism, or "Conn's Syndrome," on its website:

> Aldosterone helps control blood pressure by holding onto salt and losing potassium from the blood. The increased salt increases the blood pressure. Hyperaldosteronism is a disease in which the adrenal gland(s) make too much aldosterone which leads to hypertension (high blood pressure) and low blood potassium levels.

> Primary hyperaldosteronism can be caused by either hyperactivity in one adrenal gland (unilateral disease) or both (bilateral disease). Unilateral disease is usually caused by an aldosterone producing adenoma (benign tumor) and less commonly by adrenal cancer or

ECF 21-12 at 23, ¶97. The endocrinologist recommended terminating the prescription for Aldactone and substituting Eplerenone, 50 mg once a day. *Id.* Additionally, laboratory studies were recommended as well as a return visit in three months for further evaluation. *Id.*

### B. Warden Bishop

In response to Mr. Fuller's allegation that he failed to supervise medical staff and respond appropriately to ARP complaints regarding medical care, Warden Bishop asserts that he never personally responded to any of the ARP complaints referenced and he does not have the authority to dictate the kind of treatment an inmate receives from a medical care provider. ECF 22-1. Other correctional personnel investigated each ARP complaint, as noted:

ARP-NBCI 0090-16 (*see* ECF 1-1 at. 184) was filed by Mr. Fuller on January 9, 2016, alleging medical staff were "allowing [his] pain medication for arthritis, etc. . . . to run out throwing [him] in body wide pain that causes [his] blood pressure to spike and . . . to experience withdrawals." ECF 22-2 at p. 12. The February 4, 2016 response, signed by Acting Warden Roderick, indicates that the correct paperwork was not completed by medical staff when Mr. Fuller's Ultram was renewed on November 19, 2015,[9] but the error had been corrected on January 4, 2016, and at the time of the ARP response he was receiving his medications. *Id.* at 12 and 13. The response was based on an interview with Ryan Browning, LPN as well as relevant medical records. *Id.* at 13-26.

---

hyperplasia (when the whole gland is hyperactive). Bilateral disease is usually caused by bilateral hyperplasia (when both glands are hyperactive). There are rare genetic syndromes like familial hyperaldosteronism type I and II which may cause both glands to be hyperactive.

https://columbiasurgery.org/conditions-and-treatments/primary-hyperaldosteronism-conns-syndrome (last visited November 20, 2019).

[9] The Ultram prescription expired on December 24, 2015 but had been incorrectly reordered on November 19, 2015. ECF 22-2 at 13.

In ARP-NBCI-0876-19 (*see* ECF 1-1 at 17), filed on May 5, 2019, issues concerning a skin rash, delays in receiving a test to biopsy the growth on Mr. Fuller's kidneys, failure to provide arthritis medication, and the failure to provide "corn pads" for a plantar's wart on the bottom of his left foot were raised. ECF 22-2 at 50. Because the ARP concerned more than one issue it was procedurally dismissed with instructions to resubmit it by May 24, 2019. *Id*. In an undated and unsigned response, the ARP was dismissed for failure to resubmit it by the due date given. *Id*.

ARP-NBCI-1097-19 (*see* ECF 1-1 at 11), which was filed by Mr. Fuller on June 2, 2019, concerns delays in refilling medications and a delay in receiving a kidney biopsy. ECF 22-2 at 51. Specifically, Mr. Fuller states that he turned in the "stickers" for purposes of refilling his medications, but by then he had already gone without low dose aspirin "in excess of 30 days," had run out of Norvasc two weeks prior to the ARP date, and was out of lisinopril. *Id*. He adds that one of his medications, Aldactone, was reduced before tests were conducted to determine whether the growth on his kidneys was cancerous. *Id*. The ARP was dismissed on June 3, 2019, without response or investigation on the basis that it was "repetitive, or has been previously addressed," referencing ARP-NBCI-1052-19. *Id*. In response to the referenced ARP, Acting Warden J. Nines dismissed ARP-NBCI-1052 on June 26, 2019, stating that an "[i]nvestigation found that you have not submitted any sick call requests regarding medications." ECF 22-2 at 80. The investigation summary reads as follows:

> None of the sick calls that were attached with this ARP were found in medical records. The chronic care visit from 5/10/2019 gives a list of medications that were renewed. Aspirin, Lisinopril, Imdur, Norvasc were not renewed. On 5/28/2019, Imdur was renewed. It is documented that on 5/9/2019, the patient received 60 tablets of Lisinopril, 30 tablets of Norvasc, 60 tablets of Hydralazine, 30 tablets of Imdur. On 5/11/2019, the patient received 30 tablets of Lipitor. These were all a one month's supply. Norvasc and Lisinopril were renewed on 6/10/2019 and the patient received a 30-day supply of each. It is unknown at this time if the provider wanted to continue the other medications

that were not received/renewed due to medical concerns. The provider has been
notified.

ECF 22-2 at 88.

In ARP-NBCI-0054-19 (*see* ECF 5-1 at 3), filed on January 2, 2019, Mr. Fuller claimed
that his potassium levels were not properly monitored; that the potassium supplement and
potassium sparing diuretic he was on was improperly stopped; and that he required hospitalization
due to his potassium level crashing to 1-4. ECF 22-2 at 57. The investigation into this complaint
indicates that Mr. Fuller was sent to the ER on December 11, 2018 with a potassium level of 2.8.
*Id*. at 62. He was evaluated the following day in the infirmary and a prescription for 40 meq of
potassium for five days was ordered and completed. *Id*. He was discharged from the infirmary on
December 19, 2018. *Id*. On January 7, 2019, labs were drawn and established Mr. Fuller's
potassium level had increased to 3.1. *Id*. On January 19, 2019, there was an order for Mr. Fuller
to receive 60 meq of potassium for five days with a decrease to 40 meq thereafter. *Id*. On February
1, 2019, Mr. Fuller's potassium "was 3.1, potassium increased to 60 meq." *Id*. The ARP was
dismissed as being without merit on February 9, 2019, and bears Acting Warden Nines' signature.
*Id*. at 57.

ARP-NBCI 1536-18; (*see* ECF 13-2 at 19), filed on September 18, 2018, concerns Mr.
Fuller's claim that his medical records contained a false statement that he threatened medical staff.
ECF 22-2 at 116. The ARP complaint was dismissed on October 12, 2018, by Acting Warden
Nines stating it was documented on October 18, 2017, that "you were hostile and demanding and
asked to leave the exam room due to safety concerns." *Id*. It also notes that the provider "requested
the Ultram to be a 120 day supply, however it was only approved for 30 days" with a
recommendation for Mr. Fuller to increase his dose of Tylenol. *Id*. An appeal to the Commissioner
of Correction was unsuccessful. *Id*. at 114.

ARP-NBCI-1595-18 (*see* ECF 13-2 at 24),[10] filed on September 27, 2018, concerned Mr. Fuller's complaint that Nurse Holly Pierce reordered his pain medication but did not submit it properly, which meant he had to be restrained for a trip without pain relief. ECF 22-2 at 139. He also alleges that he was misdiagnosed with osteoarthritis when in fact he has RA. *Id*. He asks for $1000 per day that he was forced to suffer. *Id*. On October 31, 2018, Acting Warden Roderick found the complaint meritorious because there was in fact a delay in Mr. Fuller's prescription for Ultram that was prescribed on September 14, 2018, but was not approved by the regional medical director until October 3, 2018. *Id*. The request for damages as relief was denied as "without merit." *Id*.

**Standard of Review**

**A.     Summary Judgment Standard**

Defendants' motions shall be treated as motions for summary judgment because matters outside the pleadings will be considered. Summary Judgment is governed by Fed. R. Civ. P. 56(a), which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

---

[10]     ARP-NBCI-1642-18 (*see* ECF 13-2 at 27) was dismissed on October 6, 2018, as repetitive of this ARP. ECF 22-2 at 149-153. ARP- NBCI-1816-18 (*see* ECF 13-2 at 38) was deemed repetitive of this ARP as well as ARP-NBCI 1536-18 and dismissed. ECF 22-2 at 163-172

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**B.     Eighth Amendment Standard**

The claims concerning Mr. Fuller's medical care are raised as Eighth Amendment claims. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of an objectively serious medical need).

After a serious medical need is established, a successful Eight Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes

essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

## Analysis

### A.    Medical Defendants

To be clear, Mr. Fuller's various medical issues qualify as objectively serious medical needs. It is evident from the record that his hypokalemia and hypertension have been the cause for multiple hospitalizations and his osteoarthritis and RA are the cause of serious chronic pain. *See Lightsey*, 775 F.3d at 179 (act of prescribing treatment raises fair inference that physician deemed treatment necessary). The seriousness of his conditions has been acknowledged by Corizon's employees and Defendant Holly Pierce.

The claim fails, however, when the subjective knowledge component is considered in light of the evidence presented. There is nothing on the record before this Court to suggest that Pierce, or any of her colleagues, refused to treat Mr. Fuller's serious medical needs. He has received numerous tests, is frequently monitored, and he has been sent to an outside hospital when his condition became grave. He is under the regular care of an endocrinologist, his potassium levels are being monitored, and he is being prescribed specific dosages of potassium supplements. The conduct of the Medical Defendants in treating Mr. Fuller is inconsistent with a recognition that

their actions were insufficient to mitigate the risk of harm. *See Parrish*, 372 F.3d at 303 (requiring knowledge of general risk and that conduct is inappropriate).

To the extent that he was not diagnosed with RA prior to the cessation of his Ultram prescription, a missed diagnosis alone does not constitute an Eighth Amendment violation. *See Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999); *see also Johnson*, 145 F.3d at 166 ("any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."). The decision to terminate Mr. Fuller's Ultram prescription, made by Dr. Odifie, was not for the purpose of causing harm; rather, there was concern about the overuse of the synthetic opioid for treatment of conditions that do not warrant its use. The prescription was temporarily reinstated pending Mr. Fuller's consultation with a rheumatologist. There is no indication that Mr. Fuller's treatment differed from that which a non-prisoner patient might experience in similar circumstances.

Moreover, Mr. Fuller's claim against Corizon lacks any specific allegation against the corporate entity other than its status as the employer of Holly Pierce. A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 F. App'x 279, 282 (4th

Cir. 2009). Further, to the extent that Mr. Fuller's claims might be more appropriately leveled at other Corizon employees who were not named as defendants, the evidence in this record does not support a claim against those who were involved in his care or who made decisions regarding which medications he should receive.

Mr. Fuller's allegation that the growths found on his kidneys was caused by the use of an "experimental drug" is, at best, a claim of malpractice[11] which, as noted above, does not state an Eighth Amendment claim. His assertion that the quality of his care declined when he was transferred out of "a Negro controlled Maryland Prison district" in 2011 (ECF 25 at 1), is not supported by the evidence before this Court, nor does Mr. Fuller provide any independent basis for such a claim other than his opinion. Further, any claim arising out of alleged neglect in 2011 is time-barred. *See Owens v. Okure*, 488 U.S. 235, 239 (1989) (42 U.S.C. § 1988 endorses borrowing of State statute of limitations most analogous to the particular § 1983 action). Maryland's most analogous statute of limitation is found at MD. Cts & Jud. Proc. Code § 5-101, which requires a cause of action to be filed within three years of the date of occurrence.

## B.    Warden Bishop

As demonstrated by the record evidence, Warden Bishop did not review or issue decisions in the ARP complaints filed by Mr. Fuller regarding his medical care. Even if Mr. Fuller had named the acting wardens who did review his ARP complaints, however, the claim fails to state an Eighth Amendment violation.[12]

---

[11]    Mr. Fuller relies on a brochure published by a personal injury law firm for the proposition that one of the drugs he took from 2011 to 2015 causes kidney cancers. First, the brochure is an advertisement that does not directly address Mr. Fuller's condition and secondly, there is no evidence that Mr. Fuller has kidney cancer. Additionally, the claim, if there is one that is viable, is more appropriately brought against the manufacturer of the drug, not the medical providers who prescribed it.

[12]    Because this Court finds that the claim is without merit, it does not address Defendant's assertion that Mr. Fuller failed to exhaust administrative remedies.

First, as established above, the medical care provided to Mr. Fuller did not run afoul of the Eighth Amendment. Thus, Warden Bishop, or his colleagues acting in his stead, cannot be charged with the knowledge that Mr. Fuller was being subjected to cruel and unusual punishment; he was not so subjected. Secondly, the mere receipt and processing of an ARP, without more, is insufficient to impose liability. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation) (citing *Whitington v. Ortiz*, 307 F. App'x 179, 193 (10th Cir. 2009) (unpublished) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations."). Absent personal participation in the alleged violation, the claim fails to sufficiently allege a basis for Warden Bishop's liability. *See Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

To the extent that Mr. Fuller could have included as defendants the staff members involved in processing, investigating, and responding to his ARPs, there is nothing in this record to indicate those claims would be meritorious, or that the above analysis would not apply. Warden Bishop and his counterparts are not liable for every act of every staff member operating within the confines of NBCI simply because they hold supervisory positions or were informed of Mr. Fuller's numerous grievances. *See Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)) (respondeat superior is not a basis for liability in 1983 litigation).

## Conclusion

For the reasons stated herein, Defendants are entitled to summary judgment in their favor and their motions shall be granted. Plaintiff's pending Motion to Proceed in Forma Pauperis shall

be granted except to the extent payment of the fee shall be required as mandated by 28 U.S.C. § 1915 and his Motion for Appointment of Counsel shall be denied.  A separate Order follows.


___February 7, 2020_____                    _____/S/_____
Date                                          Paul W. Grimm
                                              United States District Judge